UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENISE CHILDERS,

               Plaintiff,                             Case No. 16-14428

v.                                              Honorable Nancy G. Edmunds

GENERAL MOTORS LLC,

               Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [88]**

Plaintiff Denise Childers ("Plaintiff") brought this lawsuit against her employer, Defendant General Motors LLC ("Defendant" or "GM"), alleging that it created a hostile work environment and discriminated and retaliated against her on the basis of her race and age in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), and 42 U.S.C. § 1981 ("§ 1981").[1]  (Dkt. 69.)  Plaintiff also alleges that Defendant failed to make reasonable accommodations under the Americans with Disabilities Act ("ADA").  (*Id.*)  The matter is before the Court on Defendant's motion for summary judgment on all claims.  (Dkt. 88.)  Plaintiff filed a response, and Defendant filed a reply.  (Dkts. 110, 118, 119.)  The Court heard oral arguments on the motion on January 9, 2019.  For the reasons discussed below, the Court GRANTS IN PART and DENIES IN PART Defendant's motion.

---

[1] Originally, Plaintiff also asserted a claim pursuant to Michigan's Elliott-Larsen Civil Rights Act.  (Dkt. 4, Pg ID 33.)  However, the Court declined to exercise supplemental jurisdiction over that claim and entered an order dismissing it.  (Dkt. 10.)
Plaintiff's claim pursuant to § 1981 was added in her Second Amended Complaint after she sought, and the Court granted, leave to file it.  (*See* Dkt. 68.)

## I.    Background

Plaintiff began working for GM in 1989 and has been a Level 7 Lead Corporate Auditor in GM's internal audit department, which is known as General Motors Audit Services ("GMAS") from 2005 to the present.  (*See* dkt. 110-2, Pg ID 4287.)  In January 2013, GM hired Dottie Appleman as a manager in GMAS.  (Dkt. 110-3, Pg ID 4296.)  In July 2013, Appleman gave Plaintiff positive feedback in her 2013 Commitment and Accountability Partnership ("CAP").  (*See* dkt. 110-4, Pg ID 4368-69.)  She also suggested "improv[ing] professional flexibility, understanding, [and] adaptability" and "establish[ing] ways to work collaboratively."  (*Id.* at Pg ID 4369.)  Appleman assigned Plaintiff to replace a different auditor as the lead auditor on the 2013 Global Business Services Audit, which was a large and complex audit.  (Dkt. 110-3, Pg ID 4308.)

In July 2013, Plaintiff confronted Tom Yoder (a GMAS director) regarding a racist comment made about a new African-American employee by the name of Chase Collins. (Dkt. 110-5, Pg ID 4411.)

Crystal Gonzalez was hired by GM in August 2013 as a senior auditor.  (Dkt. 110-9, Pg ID 4532.)  Gonzalez had previously worked with Appleman.  (*Id.* at Pg ID 4534.)  In September 2013, Plaintiff verbally complained to Appleman that Gonzalez and some of their co-workers were becoming intoxicated while traveling with the team and engaging in non-work-related activity during work hours.  (Dkt. 110-5, Pg ID 4392.) Her co-workers had also told her that she should retire soon and that people her age were not interested in devices such as the Fitbit.  (*Id.* at Pg ID 4393.)  On one occasion, Gonzalez was talking about Plaintiff nearing retirement age in front of Appleman, who responded by stating that Plaintiff should work for another ten years.  (*Id.*)

In November 2013, Yazmin Wong began working for GM as a lead auditor in GMAS.  (Dkt. 110-15, Pg ID 4578-79.)  She too had previously worked with Appleman.  (*Id.* at Pg ID 4581.)  Appleman appeared to be friends with both Gonzalez and Wong.

In January 2014, Appleman gave Plaintiff a positive performance review in her 2013 Year-End review, which stated that Plaintiff "achieves expectations" for behaviors and performances.  (Dkt. 110-4, Pg ID 4371, 4373.)  The review noted that the audit Plaintiff had been leading was not finished.  (*Id.* at Pg ID 4371.)  Appleman told Plaintiff she would continue to be the lead on the GBS audit in 2014.  (Dkt. 110-5, Pg ID 4404.)

In the summer of 2014, Wong played a video Plaintiff felt was "nasty" and "raunchy" in front of her; Wong told Plaintiff that "these are your people."  (*Id.* at Pg ID 4400.)  Plaintiff told Wong that the video was inappropriate and that she should turn it off.  (*Id.*)  Plaintiff also testified that Gonzalez made comments such as "black people are always late" or "black people do meth."  (*Id.* at Pg ID 4408.)

Plaintiff later complained to Appleman about the inappropriate video and about the behavior of both Wong and Gonzalez.  (*Id.* at Pg ID 4401.)  Plaintiff felt that Wong and Gonzales were "like a bunch of roaming high school bullies."  (*Id.*)  She also complained to Appleman that Collins was fired for doing the same things others were doing.[2]  (*Id.* at Pg ID 4402.)

In July 2014, Appleman gave Plaintiff a lower performance review, stating that she only "minimally" met expectations for business results and "partially" met expectations for leadership behaviors.  (Dkt. 110-17, Pg ID 4654.)  There was a note regarding the need to work on her interpersonal "savvy/flexibility."  (*Id.* at Pg ID 4659.)

---

[2] Collins had been fired in May of 2014.  (Dkt. 110-5, Pg ID 4402.)

On October 1, 2014, a disturbing incident allegedly occurred. Plaintiff was seated in a conference room when Wong and Gonzalez entered. (Dkt. 110-5, Pg ID 4450.) Wong asked Plaintiff if she was ready for lunch. Plaintiff responded that she needed five to ten minutes. According to Plaintiff, at that point, Wong told her to get up and punched her 6-8 times in the neck. (*Id.* at Pg ID 4451.) Plaintiff cried "don't touch me," leading Wong to point her finger in Plaintiff's face and taunt her by mimicking her "don't touch me" cries. She mimicked her the next day as well. (*Id.* at Pg ID 4454.) Other witnesses described the incident differently. They stated that Wong "tapped" or "poked" Plaintiff. (*See* Dkt. 110-25, Pg ID 4702.)

Plaintiff informed Appleman of this incident via an instant message close to two weeks later—on October 13, 2014. (Dkt. 110-21, Pg ID 4683.) Plaintiff testified that she attempted to report the incident earlier but was told that Appleman was unavailable. (Dkt. 110-5, Pg ID 4461.) Appleman asked Plaintiff to provide a typewritten account of what took place. (*Id.* at Pg ID 4462.) Appleman also asked Wong to provide her with a written summary of her own account of what transpired. (Dkt. 110-23, Pg ID 4688.) Wong admitted to poking Plaintiff multiple times. (*Id.* at Pg ID 4687.)

On October 22, 2014, Appleman filed a formal report regarding Plaintiff's complaint with GM security. (Dkt. 110-24, Pg ID 4693.) Henry Jackson from GM Security conducted an investigation regarding the October 1 incident. His conclusion was that "it appears Wong did use her index finder to touch Childers on the back of her shoulder." (*Id.* at Pg ID 4702.) On February 18, 2015, Plaintiff was informed that the investigation found "no evidence of wrong doing" on the part of Wong. (See Dkt. 110-33, Pg ID 4764.)

During October 2014, Plaintiff asked Appleman if she could work from home on Tuesdays, but Appleman told her that she preferred her not to. (Dkt. 110-5, Pg ID 4475.) In February of 2015, Appleman asked human resources for permission to terminate Plaintiff. (*See* dkt. 110-41, Pg ID 4805.) She was informed that because Plaintiff had never been placed on a performance improvement plan ("PIP"), termination was unwarranted and that "[i]n fact, a review of her CAP's [sic] since 2010 provide that at the worst, [Plaintiff] was inconsistent." (*Id.*)

Plaintiff's 2014 year-end review, which she eventually received in March of 2015, stated that "[Plaintiff]'s professional credibility and capacity are low" and that she "participated in disagreements at work. It will take a sincere effort and a lot of work for [Plaintiff] to regain people's trust again." (Dkt. 110-17, Pg ID 4659, 4657.) The review also stated that Plaintiff's "actual output and work product is that of a lower level auditor and generally does not perform at a lead auditor level a majority of her time . . . she is not proactive and not a good time manager." (*Id.* at Pg ID 4657.) Appleman also stated that "[i]n response to [Plaintiff]'s inconsistent performance, management has assigned [Plaintiff] to participate in audits as opposed to leading them." (*Id.*)

Plaintiff alleges that on March 24, 2015, she requested 1.5 hours of leave time for weekly medical appointments, but that request was denied and she was told she would be required to take unpaid leave. (Dkt. 110-47.) Emails show that Plaintiff was informed by human resources to contact the disability manager, who would decide whether the leave time would be paid or unpaid. (*See id.*)

As a result of her unfavorable review for 2014, Plaintiff was placed on a PIP. (*See* dkt. 110-48.) As a part of this PIP, Plaintiff was assigned to lead an audit. Initially,

she received positive performance reviews for her work on the 2015 audit, but starting in September 2015, she began to receive negative performance feedback. (*See id.* at Pg ID 4847.) Management concluded in October of 2015 that because some of the objectives in the PIP were not consistently met, Plaintiff would no longer be leading audits. (*Id.* at Pg ID 4851.) However, because Plaintiff generally satisfied her PIP goals, she was released from the PIP. (*Id.*)

Plaintiff alleges that she was set up to fail during the course of the PIP and that Appleman had already decided that she did not want to assign her to lead audits, as reflected by her statement in Plaintiff's 2014 performance review. Plaintiff further alleges that she was not given sufficient resources to successfully complete that audit. Plaintiff did, however, take responsibility for some of the problems that arose during the course of that audit. For example, in an email to her supervisor dated September 18, 2015, she stated: "FYI, the bottom line is that I take responsibility/am accountable for the [audit], including deadlines missed, etc." (Dkt. 88-3, Pg ID 2602.)

On January 28, 2016, Plaintiff filed her EEOC claim. (*See* dkt. 110-49.) In February 2016, she assisted with a small project and received positive feedback. (*See* dkt. 110-50, Pg ID 4856.) She alleges, however, that she was not given any audit assignments until she went on disability leave in January of 2017.[3] Moreover, she alleges she was forced to scan documents and manually transfer electronic files, despite requesting assignments. (*See* dkt. 110-54, Pg ID 4885.) She also requested to

---

[3] This followed a cancer diagnosis. Her failure to accommodate claim under the ADA, discussed below, relates to her health prior to this diagnosis.

work from home for three half days during December 2016, but her supervisor denied that request.  (Dkt. 110-56, Pg ID 4895.)

Plaintiff alleges that she was denied a raise that all other Level 7 Lead Auditors received in January of 2015 (except for one other employee who was also African-American).  Defendant concedes that Plaintiff did not receive a raise that year due to her 2014 performance review but notes that she received a TeamGM bonus.  (See dkt. 118-1, Pg ID 5514.)  Defendant also notes that the other African-American employee who did not receive a raise that year was ineligible for one because she was at the top of the salary range for a Level 7A auditor.  (*See id.* at Pg ID 5513.)  Instead, she received a lump sum bonus and a TeamGM bonus.  (*Id.*)  Defendant also notes that Plaintiff received a rating of "achieves expectations" as well as a 1.95% salary increase and a $15,000 bonus in 2016.

## II.    Summary Judgment Standard

It is well established that summary judgment under Federal Rule of Civil Procedure 56 is proper when "'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)).  When reviewing the record, "'the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.'"  *Id.* at 327 (quoting *Tysinger v. Police Dep't of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)).  Furthermore, the "'substantive law will identify which facts are material,' and 'summary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party.'" *Id.* at 327 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering the material facts in the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## III. Analysis

### A. Discrimination Claims

Title VII makes it unlawful for an employer to discriminate against an employee on the basis of his or her race. *See* 42 U.S.C. § 2000e-2(a)(1). Racial discrimination claims can also be brought under § 1981. The ADEA prohibits discrimination by an employer on the basis of age. *See* 29 U.S.C. § 623(a)(1). Because Plaintiff does not have any direct evidence of discrimination and instead relies on circumstantial evidence, the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Under this framework, if the plaintiff establishes her prima facie case of discrimination, the burden of proof shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. *Id.* If the defendant provides such legitimate reasons, the burden of proof returns to the plaintiff to rebut the defendant's proffered reasons by showing them to be pretextual. *Id.* at 414-15.

To establish a prima facie case of discrimination,[4] Plaintiff must show that 1) she was a member of a protected class (under the ADEA, she was older than 40 years old),

---

[4] The elements of a prima facie case under § 1981 are the same as those in a Title VII action. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999).

2) she was subject to an adverse employment action, 3) she was qualified for the position, and 4) she was treated differently than similarly-situated employees outside of the protected class (under the ADEA, younger employees). *Id.* at 415, 417.

Here, there is no dispute that Plaintiff is a member of a protected class and that she is qualified for her position. Defendant disputes, however, elements two and four of Plaintiff's prima facie case. More specifically, Defendant argues that Plaintiff was not subjected to an adverse employment action and that she cannot demonstrate that she was treated differently from similarly-situated employees. Defendant also argues that even if Plaintiff could establish a prima facie case of discrimination, she cannot establish that her employer's legitimate non-discriminatory reasons for its adverse employment actions were a pretext for race and age discrimination.

### 1. Whether Plaintiff Suffered Adverse Employment Actions

An adverse employment action is a "'materially adverse change in the terms or conditions of the employment because of the employer's actions.'" *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007) (quoting *Allen v. Mich. Dep't of Corrs.*, 165 F.3d 405, 410 (6th Cir. 1999)). This materially adverse change

> must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Id.* at 594 (quoting *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002)).

Being placed on a PIP and receiving non-satisfactory work reviews are not materially adverse acts. *See Choulagh v. Holder*, 528 F. App'x 432, 438 (6th Cir. 2013) (unpublished). Instead, Plaintiff focuses on the following allegedly adverse employment

actions: 1) receiving lower bonuses than her peers, 2) being relegated to the role of a Level 6 Senior Auditor although she kept her lead title, 3) not being given audit assignments for an entire year, and 4) being required to scan documents and organize electronic files for six months.

Plaintiff receiving lower bonuses and being relegated to the role of a Level 6 Senior Auditor are also not sufficient to constitute adverse acts, because there was no change in Plaintiff's wages, benefits, or title.[5]  *See id.* (finding the alleged actions "*de minimis* at best" because they did not "result[] in a decrease in salary, a less distinguished title, or a loss of benefits").  Plaintiff argues, however, that because she was required to scan documents and organize electronic files for six months, her material responsibilities were significantly diminished.  The Court need not decide whether these reduced responsibilities, on their own, are sufficient to create a jury question on this issue in light of the Court's finding that Plaintiff cannot show she was treated differently from similarly situated employees.

### 2.  Whether Plaintiff was Treated Differently

To prove different treatment, Plaintiff must show that she was treated less favorably than co-workers who were similarly situated for the same or similar conduct. *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004).  To be similarly situated, "the individuals with whom [she] compares herself 'must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish

---

[5] In fact, Plaintiff received a raise and bonus in both 2014 and 2016.  (Dkt. 110-2, Pg ID 4287-88; dkt. 118-1, Pg ID 5514.)  She also received a bonus in 2015. (See dkt. 118-1, Pg ID 5514.)

their conduct or the employer's treatment of them for it.'" *Id.* at 906 (quoting *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 599 (6th Cir. 2001)).

Defendant argues that there are no other employees who reported to the same supervisors as Plaintiff and had similar performance deficiencies that were treated more favorably. Defendant also notes that Plaintiff continues to work as a Level 7 auditor in GMAS, she received a raise and a bonus in 2016, and she has not been placed on a PIP again. Plaintiff responds by arguing that she in fact performed better than other auditors who were treated more favorably. She also disputes the accuracy of her reviews.[6]

Plaintiff had, however, admitted that she at times missed deadlines. Thus, even though she may not agree with every statement in her reviews, the record shows that she did have performance deficiencies. This differentiating circumstance explains why she did not receive a raise in 2015 and received lower bonuses than some of her peers. And while Plaintiff argues that she was actually a stronger performer, she does not have any relevant evidence of this. She points to the fact that Appleman had her replace a younger Caucasian as a lead on the 2013 Audit due to her greater skillset. However, her performance deficiencies arose during the course of that audit. The evidence of her performance prior to that audit is of little relevance to the treatment she received afterwards. She also points to the testimony of a co-worker by the name of Todd Grafton, who opined that Plaintiff was better than other Level 7 auditors. (Dkt. 110-16, Pg ID 4624.) However, Grafton is someone who had worked under Plaintiff's

---

[6] For example, Plaintiff argues that comments regarding her using her personal phone during work hours were untrue.

supervision and who she had, in fact, criticized.  She also points to a statement made

by a manager by the name of Kevin Seitz that she and Grafton were the "stronger

performers," but the only evidence of that statement is Grafton's testimony.  Thus, there

is no evidence in the record from which a reasonable jury could conclude that Plaintiff

was treated differently from similarly situated employees.[7]  Because Plaintiff is unable to

prove her prima facie case of discrimination, there is no need to discuss the issue of

pretext.  GM is entitled to summary judgment on Plaintiff's discrimination claims.

### B.    Retaliation Claims

Title VII makes it unlawful for an employer to discriminate against any of its

employees because that employee "has opposed any practice made an unlawful

employment practice by this title."[8]  42 U.S.C. § 2000e-3(a).  The ADEA contains a

similar anti-retaliation provision.  *See* 29 U.S.C. § 623(d).  Retaliation claims can also

be brought under § 1981.  *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457

(2008).  Because Plaintiff does not have any direct evidence of retaliation and instead

relies on circumstantial evidence, the burden-shifting framework articulated in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), that is discussed above

applies.  *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013).  In order to

establish her prima facie case of retaliation, Plaintiff must establish that 1) she engaged

in protected activity, 2) GM knew she exercised a protected right, 3) an adverse

employment action was subsequently taken against her, and 4) there was a causal

connection between the protected activity and the adverse employment action.  *See*

---

[7] Also, there is evidence in the record that other auditors were similarly asked to perform non-substantive tasks, such as moving boxes.  (*See* dkt. 110-16, Pg ID 4625.)

[8] This is known as the opposition clause of the anti-retaliation provision.

*Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000) (Title VII); *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007) (ADEA); *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001) (§ 1981). "The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013) (internal quotations and citation omitted).

### 1.  Whether Plaintiff Engaged in Protected Activity

To prove that she engaged in protected activity, Plaintiff "must establish that [s]he challenged an employment practice [s]he reasonably believed was unlawful." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015) (citation omitted). While the complaint does not need to be made "with absolute formality, clarity, or precision," "vague complaints do not constitute opposition." *Id.*

Here, Plaintiff contends that she engaged in several types of protected activity: 1) making complaints to Appleman about her co-workers' behavior, which she characterizes as discriminatory as well as creating a hostile work environment, 2) confronting a director (Yoder) about making a racist remark to an African-American co-worker (Collins), 3) complaining to a supervisor (Appleman) about Collins being fired for the same things other (non-African-American) employees were doing, and 4) filing an EEOC claim. Defendant agrees that filing an EEOC claim constitutes protected activity but argues that the remaining acts do not.

In *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989), the Sixth Circuit Court of Appeals considered whether an employee's complaints constituted protected activity. The court noted that most of the complaints made by the employee in that case contested the correctness of a decision made by the employer

and not any unlawful employment practice.  And while the employee had complained about a racist statement made by a co-worker and asserted that the company's critique of his management style was "a case of ethnocism," the court reasoned that this charge was too vague to put the employer on notice that he was opposing an unlawful practice. *Id*.  Ultimately, the court concluded that the plaintiff had not stated a cause of action for retaliation.  *Id.* at 1313-14.

In contrast, in *Yazdian*, 793 F.3d at 646, the Sixth Circuit found that the employee had made six statements to his employer that were specific enough to qualify as protected activity.  Those statements were: "I'm going to respond with counsel;" "I'm going to bring you up on charges;" "bring a lawsuit," hostile work environment;" "I will have an attorney respond;" and "I will be responding with charges."  *Id.*  The court reasoned that these complaints, particularly the hostile work environment comment, put the employer on notice that the employee believed his supervisor's conduct was unlawful.  *Id.*

The Court finds the complaints made to Appleman in this case more akin to the vague comments in *Booker* than the specific comments made in *Yazdian*.  Plaintiff did not use any specific term of art, like the employee in *Yazdian*, to put GM on notice that she believed her co-workers' behavior constituted race and age discrimination or that they created a hostile work environment.  With regard to her complaints that Collins was fired for doing the same things other people had done, there is no evidence that she told Appleman that she believed this was due to his race.  Without having told Appleman that she believed any disparate treatment was due to Collins' race, there is no way that

GM would have known that Plaintiff was lodging a complaint of race discrimination.[9]  To be deemed protected activity under a particular statute, the plaintiff must have referenced acts of discrimination under that statute.  *See Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 592 (6th Cir. 2007) (finding that Plaintiff's complaints about the denial of his promotion did not constitute protected activity under the ADEA because he did not indicate that he believed he was denied the promotion due to age discrimination or that his employer engaged in any unlawful employment practice).  Similarly, while Plaintiff reported the alleged assault, she did not indicate that she believed the assault was related to any race or age discrimination or that it was part of a hostile work environment.  To the contrary, Plaintiff herself stated, in an October 28, 2014 email: "[Wong] is my colleague and friend.  I do not think she knew I have pinched nerves (neck/back); and, I know she would never, ever (purposely) do anything to harm me." (Dkt. 88-3, Pg ID 2642.)  In sum, the Court finds that the complaints made by Plaintiff to Appleman were too vague to put Defendant on notice that she believed an unlawful employment practice related to race or age discrimination or a hostile work environment was taking place.

Plaintiff also alleges that she complained to Yoder about a racist remark he had made.  The Court finds that this isolated complaint is an insufficient basis for Plaintiff's

---

[9] The Court also notes that the Sixth Circuit has stated that an employee's complaints "about management practices" are too vague to constitute opposition to employment discrimination.  *See Yazdian*, 793 F.3d at 647 (citation omitted).  Here, it appears much of Plaintiff's frustration stemmed from the perceived friendship between Appleman and Gonzalez and Wong.  Complaining that Collins was fired for doing the same things others were doing could simply be construed as a complaint about that bias.

retaliation claims.[10]  This leaves the filing of the EEOC complaint as the only protected activity undertaken by Plaintiff.  As Defendant correctly notes, many of the adverse acts alleged by Plaintiff occurred before the filing of the EEOC complaint and, thus, she cannot show causation with regard to those acts.  The Court will, therefore, continue its analysis of Plaintiff's retaliation claims with regard to the acts that took place after the EEOC complaint only.

### 2.  Whether Plaintiff Suffered Adverse Employment Actions

Plaintiff's burden of establishing an adverse action is "less onerous" in the retaliation context than in the discrimination context.  *See Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 67-68 (2006).  The Sixth Circuit has stated that "'if a reasonable trier of fact could conclude that a retaliatory act would deter a person from exercising [her] rights, then the act may not be dismissed.'"  *Holzemer v. City of Memphis*, 621 F.3d 512, 524 (6th Cir. 2010) (quoting *Siggers-El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005)).

The alleged adverse acts that took place after Plaintiff filed her EEOC complaint—not being assigned to an audit and being required to scan documents and organize electronic files—are sufficient to create a jury question on the issue of whether Plaintiff suffered an adverse employment action, because a reasonable jury could

---

[10] Also, there is no evidence that this complaint was ever relayed to Plaintiff's supervisor or anyone else that made decisions with regard to Plaintiff.  Thus, even if this complaint was protected activity, Plaintiff cannot prove causation with regard to the adverse acts that followed this complaint.  *See Pawlaczyk v. Besser Credit Union*, No. 1:14-CV-10983, 2015 U.S. Dist. LEXIS 90591, at *35 (E.D. Mich. Apr. 13, 2015) ("if the decision-makers did not know of the protected activity, it did not cause them to take an adverse action").

conclude that an employee may be deterred from filing an EEOC complaint if she knows that she may no longer receive any substantive work assignments.

### 3. Whether there was a Causal Connection between the Protected Activity and Adverse Acts

In order to establish the causation element of her retaliation case, Plaintiff must show that her protected activity was the but-for cause for Defendant's allegedly adverse actions. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). Plaintiff filed her EEOC complaint on January 28, 2016, and informed a supervisor that she did so in early February of 2016. She alleges that she assisted with a small project that month but was not given any audit assignments until she went on disability leave the following year and was also required to scan documents and manually transfer electronic files for about six months.

The Sixth Circuit has stated that "[i]n some cases, temporal proximity alone may be sufficient" to establish causation. *See Savage v. Fed. Express Corp.*, 856 F.3d 440, 448-49 (6th Cir. 2017) (finding that "33 days between [plaintiff]'s protected activity and his suspension, and the 41 days between his activity and his termination . . . raises an inference that the adverse action was motivated by [plaintiff]'s protected activity"). And while an inference of retaliation does not arise when the adverse acts began prior to the protected activity, the type of adverse acts that took place prior to the EEOC complaint (being placed on a PIP, lower bonuses) was different than the type of adverse acts that took place after (no longer being assigned to audits, being required to scan documents and organize electronic fines). Thus, the Court finds that the close temporal proximity between Plaintiff's EEOC complaint and the reduced substantive responsibilities assigned to Plaintiff raises an inference that these acts were motivated by retaliatory

animus.  Because Plaintiff has satisfied her burden of proof regarding her prima facie case, the burden shifts to Defendant to articulate legitimate, non-discriminatory reasons for its actions.

### 4.  Whether Defendant's Proffered Legitimate Reasons were Pretextual

Defendant argues that Plaintiff's inconsistent performance and negative reviews were legitimate reasons for any allegedly adverse acts.  Plaintiff can demonstrate, however, that Defendant's proffered legitimate reason is a pretext for retaliation by showing that the proffered reason 1) has no basis in fact, 2) did not actually motivate its adverse employment actions, or 3) was insufficient to warrant the challenged adverse employment actions.  *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).

There is evidence in the record that Plaintiff was inconsistent, and she had even admitted that she at times missed deadlines.  Plaintiff argues, however, that her reviews indicated that she performed at the level of a Level 6 auditor and thus, her inconsistent performance and negative reviews would only justify her placement on a PIP, the elimination of her lead role, and the lower bonuses but would not justify refusing to give her audit assignments for an entire year and requiring her to scan documents and organize electronic files for six months.[11]  Defendant responds by arguing that due to the ebb and flow of work, other auditors were asked to perform similar tasks.

---

[11] The Court notes that while it did not reach the issue of pretext in the context of Plaintiff's discrimination claims, by making this argument, Plaintiff appears to concede that Defendant had a legitimate, non-discriminatory reason for the adverse acts that predated the filing of the EEOC complaint by Plaintiff.  By identifying this intervening event (the filling of an EEOC complaint), Plaintiff strengthens her argument regarding a possible retaliatory animus following this protected activity but weakens her argument regarding a discriminatory animus.  If Defendant had discriminated against Plaintiff, it

The Court first notes that the adverse acts at issue, namely Defendant not giving Plaintiff any audit assignments and requiring her to scan documents and organize electronic files, began after she filed her EEOC complaint.  And while temporal proximity alone is insufficient to establish pretext, the lack of a connection between Defendant's proffered reason and the adverse acts at issue is sufficient to raise a jury question on this issue.  This is especially true because Plaintiff had previously suffered consequences that were related to her inconsistent performance that were not as severe as the consequences she faced after the filing of the EEOC complaint.  Thus, there is a question of whether those later adverse acts were motivated by retaliatory animus.  Plaintiff's retaliation claims based upon the adverse acts she allegedly suffered after the filing of her EEOC complaint survive this motion.

### C.    Hostile Work Environment Claims

A hostile work environment claim requires proof that 1) plaintiff belongs to a protected class, 2) plaintiff was subjected to unwelcome harassment, 3) the harassment was based on race (or age), 4) "the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment," and 5) the defendant knew or should have known about the harassment and failed to take action.  *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011).  The relevant conduct must "constitute a hostile or abusive working environment both to the reasonable person and the actual victim."  *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006).  In making a determination of "whether an actionable

---

would have been doing so all along and not waited until she had filed an EEOC complaint.

hostile environment claim exists," the court looks at "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 US. 101, 116 (2002) (quotations and citations omitted).

Here, Plaintiff alleges that Wong and Gonzalez played inappropriate racially charged vidoes, acted "like a bunch of roaming high school bullies," and made age-related comments—specifically they told her she should retire soon and that people her age were not interested in devices such as the Fitbit. (Dkt. 110-5, Pg ID 4395, 4401.) Plaintiff also asserts that Wong punched her, taunted her the next day, and took her laptop, emphasizing that the first of these incidents was physically threatening and humiliating.

While Plaintiff's allegations of physical assault in the workplace are extremely troubling,[12] there is no evidence that Wong's conduct was motivated by racial animus or animus against Plaintiff due to her age.[13] Only harassment based on the plaintiff's protected status may be considered in a hostile work environment claim. *See Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 432 (6th Cir. 2014) (stating that there

---

[12] The Court notes that there is some disagreement as to what exactly occurred that day. While Plaintiff states that Wong punched her, other witnesses stated that Wong "tap[ped]" or "poke[d]" her. (*See* Dkt. 110-25, Pg ID 4702.) However, when deciding a motion for summary judgment, the Court views the record in the light most favorable to the non-moving party. Thus, the Court will assume Plaintiff was punched.

[13] Also, these incidents occurred over a short period of time and were therefore isolated, not pervasive. *See Williams*, 643 F.3d at 511 (noting the offensive statements were isolated, not pervasive, because all but two occurred over a two-day period).

was no need to consider harassment unrelated to race when assessing the overall severity or pervasiveness of the harassment) (unpublished).

With regard to Plaintiff's co-workers playing inappropriate racially charged videos and making assumptions about "black people," except for the one comment by Wong that "[t]hese are your people," (dkt. 110-5, Pg ID 4400), their racially charged comments were not directed towards Plaintiff herself.  *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 518 (6th Cir. 2009) (stating that the use of the word "nigger" by several co-workers was offensive but did not suggest harassment of plaintiff herself); *Lewis-Smith v. W. Ky. Univ.*, 85 F. Supp. 3d 885, 905 (W.D. Ky. 2015) (noting that a lack of respect for the presidency of Obama and a racial comment did not suggest harassment of Plaintiff herself).  And while the videos and race and age-related comments may have been offensive to Plaintiff, they were not severe or pervasive enough to sustain a hostile work environment claim.[14]  *See Williams*, 643 F.3d at 513 (racist statements, such as calling Jesse Jackson and Al Sharpton "monkeys" and saying black people should "go back to where they came from," were despicable but were not severe or pervasive enough to create a jury question on the hostile work environment claim); *see also Phillips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017) ("even offensive and bigoted conduct [is] insufficient to constitute a hostile work environment if it is neither pervasive nor severe enough to satisfy the claim's requirements").  GM is therefore entitled to summary judgment on Plaintiff's hostile work environment claims.

---

[14] Due to the Court's finding that the alleged harassment did not rise to the level of creating an abusive working environment, there is no need to address the final factor of whether GM knew or should have known about the harassment and failed to take action after learning of the harassment.

**D.      Failure to Accommodate Claim**

To establish a failure to accommodate claim under the ADA, Plaintiff must prove 1) she has a disability, 2) she is otherwise qualified for the job, and 3) Defendant refused to make a reasonable accommodation for the disability. *Smith v. Ameritech*, 129 F.3d 857, 867 (6th Cir. 1997).   Defendant argues that Plaintiff never requested a reasonable accommodation that was denied.  Plaintiff asserts that she requested to work from home numerous times, but that request was sometimes denied.

"The ADA does not obligate employers to make on-the-spot accommodations of the employee's choosing." *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 840 (6th Cir. 2018).  Instead, an employer is required to "engage in an informal, interactive process with the employee to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* (quotations and citations omitted).

Here, Plaintiff did not clearly tie her request to work from home to her disability. Nor does she appear to have engaged in an interactive process with her employer. *See id.* (finding that plaintiff did not state a prima facie failure to accommodate claim because he voluntarily abandoned the interactive process with his employer).  For example, when her request to work from home was denied in December 2016, she informed her supervisor that she would use her vacation and sick time instead. (*See* dkt. 110-56.)   Moreover, the record shows that Plaintiff was sometimes allowed to work from home and that she was a salaried employee who never took unpaid leave, despite a supervisor suggesting the need to do so.  (*See* dkt. 110-5, Pg ID 4470.)  GM is entitled to summary judgment on Plaintiff's failure to accommodate claim.

## IV.     Conclusion

For the above-stated reasons, Defendant's motion for summary judgment is

GRANTED IN PART and DENIED IN PART.  The claims that survive this motion are

Plaintiff's retaliation claims based on the allegedly adverse acts that followed the filing of

her EEOC complaint only.

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: February 14, 2019

I hereby certify that a copy of the foregoing document was served upon counsel of record
on February 14, 2019, by electronic and/or ordinary mail.

s/Lisa Bartlett
Case Manager